Case number 24-7032. United States of America, Ex-Rail O'Neill-Kinney and O'Neill-Kinney Appellants v. Tata Consultancy Services, LTD. Mr. Kochen for the appellant, Mr. Volchok for the affiliate. Morning, Mr. Kochen. Morning, Your Honor. May it please the Court. This case involves the misuse of the U.S. visa program to source indentured and poorly paid visa employees to replace higher-cost Americans from IT jobs. The case also involves retaliation against a whistleblower who tried to stop the fraud. There are two types of fraud that are at issue here. The first type is the failure to pay H-1B required under Department of Labor regulations. Which establish a duty to pay the alien, not the government. Duty to pay the government is set forth in the tax code. 20 C.F.R. Section 655.731c, which is entitled Satisfaction of Wage Obligations, specifically sets forth the duty to pay the government withholding taxes. If you look at the Department of Labor administrative decisions, HTC, Excel, Betty, they all involve underpayment of wages. And part of the wages, the calculation of the wages, is withholdings that are due to the IRS. Is that the distinction though? That it's an IRS tax code implication as opposed to the statute that you're governing for the visas? No, Your Honor, the obligation itself is created by Department of Labor regulation. That is to satisfy, again, the title of that regulation is Satisfaction of Wage Obligation. And to satisfy the wage obligation, the appropriate wage obligation paid to H-1B employees, you also have to have appropriate withholdings paid to the IRS. It's the Department of Labor regulation, which is squarely falls within, creates an obligation within the Reverse False Claims Act. How do we deal with the Lessnick decision? You tell that the obligation to pay visa fees only arises after submission of the application. So the Lessnick decision was rooted in A-T-M-I, a Sixth Circuit decision that was abrogated by the amendment to the False Claims Act in 2009. So the Lessnick decision stands for the proposition if something isn't immediately due, payable, and it dealt with visa fees, then it doesn't fall within the False Claims Act. That is completely contrary if you look at, for example, the Conagra decision, which motivated the amendments to the False Claims Act in 2009. The Conagra decision involved in lieu of replacement certificates under the USDA regulations, and fees apportioned that. Conagra did not seek those certificates, but still was held liable under the False Claims Act, even though it didn't seek that in lieu of certificates. So if you look at the Lessnick decision, including the lower court's decision in that case, the district judge cites A-T-M-I as support for the proposition that something that's not immediately payable or due is not actionable under the False Claims Act, and that is precisely why the False Claims Act was amended in 2009. The amendment eliminated the aspect of the Sixth Circuit decision that says you have to fix the amount. It doesn't eliminate our court's decisions on what it means to be established. Well, it's established whether or not fixed. And so the regulations and the agreements pursuant to the regulations by TCS establish the obligation. Those obligations are established when TCS agreed to participate in the H-1B visa program. It agreed to pay the appropriate wage. That was an established obligation. Yeah, I agree with you, but I guess it's just back to the reg. This comes down to whether these Romanettes, Romanette 3 is probably your best one with the FICA obligation, whether you read this as establishing an independent duty to pay FICA taxes to the government, which is an odd thing for an INA reg to do, or whether you just simply read this as this is defining what the requisite wage is, and the wage includes the FICA amounts. Well, I mean, I think that the key question is, what is the obligation to pay? And there is a key question is, to whom? There clearly are obligations for the employer to cut checks to the alien and to the government. Correct. The question is, what is the nature of the obligation that runs to the government? Well, if there's a payment required under Department of Labor regulations to the government, then that's what brings it squarely within the ambit. But that just takes us back to the question whether this Romanette is creating, independently creating a duty to pay FICA taxes or just defining what the wage of the employee is. Well, it's the duty to pay that's important. And so the whole purpose of the duty to pay would be comes from the tax code. I mean, the Department of Labor doesn't have independent authority to regulation to say pay taxes. They're implementing the tax code. So the tax code is where the obligation springs from. Correct. I mean, that is definitely is it is the tax code that requires payment of taxes. But think about what in creating the H-1B visa framework, what the government was trying to do. They were trying to make sure that that program was not being used to undercut labor markets here and salaries. And that's why they created specifically duties and obligations about you have to pay this and you have to pay it to the both the H-1B employee as well as to the government, the IRS. And so that was the whole purpose of it. And so it's, you know, there's a duty to pay the H-1B visa employee for sure. But as part and parcel of that, there's an obligation to withhold taxes and pay the taxes just as your honor suggested. That's what the obligation is. And so if you look at the lower court's decision here, the lower court concluded that payment of that obligation is actually a penalty under Hoyt as opposed to an obligation that falls within the ambit of the False Claims Act. And if you look at the decisions, if you look at Conagra and you look at PEMCO, if you look at the decision, Victaulic, if you look at the decisions that TCS cites, Kasowitz, Simino, they very well set forth the distinction between what constitutes an obligation and what constitutes a penalty. And that's the key question that's before the court. Is this an obligation or is it a penalty? And the fact that something is paid to the IRS as opposed to some other government agency, I don't think it's dispositive of the issue. I would rely on the Merck, Medco and Frye cases that support the notion that you don't look at who is ultimately paid to or how it gets to the government. The fact is, is it an obligation that reduces payments to the government? And so I think that is what is key in this case. And that's why I think that is squarely where the lower court erred on this issue. You know, just kind of as an aside, these visas come out of a lottery, right? Correct. And it's limited as to what you can get. Correct. And so it just seems almost practically that any employer going into this program who actually needs the workers is going to apply for, through the lottery, as many visas as they can. You know, the H-1 visas, but then there's a lower category of that, you know, your clients were subjected to. And so from a practical standpoint, they are working, but you all contend that it's through the wrong visa program, but there's only so many visas that you can get anyway. Correct. But that's how the system was set up. That's the whole design of the system. There's a limited number of H-1B visas, and there are specific rules set up as to when you can apply for the visa and what type of work qualifies for visa type of work. And the government through this investigation would have, I assume, looked at the duties, you know, of the particular plaintiffs here, but then decided not to take the case. And so I don't know if there's anything to read into that, or the fact that the questioning that we've been having here is that is this obligation that we're talking about not yet realized because the employer applied for certain visas and paid the payroll taxes on those particular visas that it actually got. Correct. It did, but our contention is they underpaid. The government, they obviously didn't intervene here. And if they thought this case didn't have merit, was frivolous, then they would have exercised their discretion to dismiss the case, which they didn't do. So that put the burden on us to go forward and hear, argue, and explain to you exactly why the particulars of the Department of Labor regulations create the obligation that's at issue here and do not involve penalties, which is what the lower court reasoned to why underpayment of visa fees and underpayment of wages isn't actionable under the False Claims Act. When you look at the law and you look at what constitutes an obligation compared to what constitutes a penalty, I think it's pretty clear that if you look closely at the Department of Labor regulations, that this falls within the obligation. Why is the government's non-intervention, why should we imply that that means that the government is anything other than agnostic? Well, the government has elected not to take a position at all in this case. And, candidly, to me, it's, I wish they would have just one way or another said, if you think that this isn't, if the government thinks that this is a frivolous case, it doesn't fall within the False Claims Act, they can take a position. They certainly did in the Cassowitz case. They certainly did in the on the sideline here. This is a really important case. There's been no referral to the Department of Labor or IRS? Not that we're aware of, but this is a case that affects a lot of people. There are a lot, there's a lot of interest nationally about what happens here because there's a lot of jobs at stake. And so the fact that the Department of Justice didn't weigh in here, didn't voice their opinion on this issue, I think is unfortunate. What do you think is your strongest authority that this suit is not subject to the tax bar exclusion of 3729 D, yeah, 3729 D, as a claim made under the Internal Revenue Code? The LISAC decision. The Second Circuit decision of LISAC, which is the authority on this issue. So under the LISAC decision, the IRS has no jurisdiction here and there's no violation of the Internal Revenue Code. And so that takes it squarely without, means that the tax bar will not apply to this issue. Can I ask you about your second theory? Sure. I haven't really talked about. I suppose I go to a museum and I can buy one of two tickets. I can buy general admission for $10, or I can buy a special admission for $20, which gets me into the touring, you know, money exhibit. Right. I buy the $10 ticket, I go in the museum, and then I sneak into the what I've done is defraud the museum of money. I mean, what I've done is I've bought the cheaper ticket and then I, you know, trespass into the special exhibit. Well, here's the distinction. You agree with my instinct on the hypo? Well, are you going to tell me your case is different? Are you going to tell me my instinct is wrong? I would say there's rules set up by the museum, and there must be reasons for that, for those rules. And so you should abide by the rules if you're in court. But violations, it's not an obligation to pay. Well, I mean, I've bought the cheaper ticket. Here's the distinction. Okay. That's, I think, critical. The very reason why the visa system is set up the way it is, is to ensure that if there's labor shortages here, if there are needs here for visa employees, let's set up a system to make sure that happens. But if you are going to let anyone come in and do H-1B work when there's a cap on how many H-1B visas are issued, if anyone can come in and do that work, then what you're doing is you're hurting labor markets here. There was an article published- Which is a compelling argument that the allegations here state something very serious about immigration policy. It just doesn't feel like what this case is about is whether you pay the $4,000 visa fee or the $3,000. But if there was a false... Let's assume for the purpose of this hypothetical, let's assume that there's fraud on the government. L-1 employee, for example, doing H-1B work. Let's just assume that. And so your position is, well, even though the H-1B visa costs a couple of thousand dollars more than the L-1, it doesn't seem like that's kind of what's at issue here. I understand your point, except if you look at the specific language of the Reverse False Claims Act, if payment is either avoided or decreased to the government as part and parcel of a fraudulent scheme, that's actionable. No, I get that. And so to take your point, if you're sneaking into a $20 museum piece, or if you're having an L-1 do H-1B work, that is wrong. There is a financial harm to the government. Is that what's motivating the fraud? I don't think that's relevant to the question of whether... If it's avoiding that visa fee, I don't think that's a question that's relevant to the specific Reverse False Claims Act. No, I agree with that, but it just informs the instinct. If you go back to the text of the statute, there are two ways of looking at this. One is the kind of simplistic way, consistent with my hypo, is there's a menu of things you can buy, and they're buying a cheaper license, and that's fine, and they're paying for the cheaper license, and there's nothing fraudulent. There's nothing wrong with that. The harm comes when they then later exceed the scope of the license. Well, they have a duty to pay, to seek and pay the appropriate fee. And you're saying, no, there's actually a duty on the front end to buy the more expensive license. Well, there's two issues there. One is, if they know that... I think that just takes me back to, is this really about license fees, or is this really about the harm to the labor markets when they exceed the scope of the license they bought? Well, from our perspective, you can't separate those two things out. And so I think there's two ways, two things that go on wrong, assuming an L1 employee is defrauding, there's fraud. If TCS is applying for an L1 visa, knowing that the L1 visa holder ultimately is going to do H-1B work, that's wrong, because under the form I-129, TCS has to certify that all the statements are true and correct. That's false. That's what Mr. Keeney was complaining about. He was also complaining about once L1 workers were in, working, doing H-1B work. Once they started doing H-1B work, if you look at the regulations, there was a specific requirement that TCS had to see in H-1B visa. And so if you look at 20 CFR section 700B2, that sets forth the requirement. If you're going to work in a specialty occupation covered by the H-1B visa program, you've got to submit, for example, a certified LCA. And then to do that, you have to pay the appropriate visa fees as part of that. And so I get your point. And I thought about that in preparing here. But I think the distinction here is that you have a visa program that's specifically set up where you have to require people to follow the rules. Otherwise, the labor markets in this country are going to be damaged. Bloomberg News came out with an article this week that was shockingly interesting about- I got the point. Okay. Okay. I did want to touch on your retaliation claim. Yes, Your Honor. I'm very happy that you want to do that because I do want to talk about that too. But I know I'm well over my time here. Okay. Yeah. So with respect to the retaliation claim, I assume that you would say the notice comes from the whistleblower reports to the employer, not just the complaint, which had been sealed for quite some time. Correct. There are. I mean, it started well before the complaint was filed. I mean, as soon as Mr. Keeney, the relator here, witnessed the fraud, he did everything in his power. And it is impressive the amount of work that went in on his end to try to stop the fraud. And so he was concerned about it. He wrote to the higher-ups at TCS. He refused to participate in the fraud. He tried to correct the fraud and encouraged TCS to amend applications. For example, when L-1 employees were doing H-1B work, if you look at the language of the complaints he submitted and how he tried everything in his power to make sure things were legal and legitimate, it is the poster child, in our view, for what the anti-retaliation provision of the False Claims Act is supposed to capture. This is the type of conduct that we want people to identify and notify and try to correct. And so we think on that issue as well that the lower court erred. What is your best piece of evidence that protected activity involved in the fraud? Put the employer on notice about False Claims Act exposure as opposed to immigration fraud. If you look at the statements of Mr. Kenney, I recommend we do the right and legal thing and amend our H-1B filings. Why is corporate governance not stopping and fixing this? I will not approve of any false changes. We need to amend any false changes. And to the L-1A reporting structure, we need to amend the H-1B petition. That sounds like he's complaining about immigration fraud. If you look at the Usidian decision, if you look at the Singletary decision, he saw fraud. And he saw that, for example, L-1 employees... I mean, I'm thinking of Singletary. Judge Millett and I had this debate. And part of what pushed her towards False Claims Act as well as animal rights regulations was that the complaints in that case involved payments to the government. She was worried. Singletary was worried about payments to the government. What Mr. Kenney was worried about was fraud to the government. L-1 employees, for example, doing H-1B work. That had to change. It had to amend. Did he say you have to pay visa fees as part of it? He didn't say that. But he said we have to file H-1B amendments, which by definition include payment of visa fees. If you look at the Usidian case, you don't have to have every piece of a False Claims Act case lined up, particularly for a layperson, in order to be captured under the False Claims Act's anti-retaliation provision. That's not a requirement. Otherwise, that provision would never apply because this is a very complicated law. No, that's true. And Mr. Kenney, he just saw the fraud. He wasn't thinking about visa fees per se, but he was thinking about amendments to H-1B visa applications. And he's like, we've got to do the right thing. All right. We'll give you some time on rebuttal. Okay. Thank you. May it please the court, Daniel Volchak for TCS. Judge Chutkin correctly concluded that relator's complaint does not plausibly allege either a reverse FCA violation, excuse me, or FCA retaliation. And I want to start with the taxes issue, then go to the visa issue, and hopefully I have time to talk about retaliation. So starting with the underpayment, the alleged underpayment of tax issue. You heard Mr. Kotchin say it this morning. The obligation that they are positing comes from one place, this labor law regulation, this employment law regulation. Now, it's a little counterintuitive that a tax obligation would be imposed solely by an employment law regulation. And indeed, as our brief explains, for example, on pages 13 and 18, the regulation does not impose any independent tax obligations. It refers instead to the obligations imposed by the tax code. And the critical point here is relator has expressly alleged that TCS did not commit, quote, any violation of the tax code. That's paragraph 89 of the amended complaint. And he repeats that concession on page nine of his reply brief here. And he makes that concession advertently, of course, in order to get out from under the tax code, the tax bar. But having made that obligation, having made that concession, he can't win on the employment law regulation either, because what the employment law regulation says is that in order for a covered employee's actual wages to count toward his or her legally required wage, the employer has to pay, quote, appropriate withholding for the employee's tax. Here comes the critical part that he never discusses, in accordance with the internal revenue code. That is C2A of the regulation. So what it is saying is for these wages to count toward the required wage, you have to comply with the tax code. He has expressly alleged and repeated in this court that we complied with the tax code. And that means there can be no violation of this regulation. And bear in mind, last point on this, your honors, this regulation is not even imposing freestanding obligations. You must pay this, as I said a moment ago. What C2 is saying is simply that in order for certain wages to count toward the legally required wage, you have to satisfy these various other obligations, including complying with the tax code. But it's not, you must pay a certain amount of taxes. And to the extent it is, the amount of taxes that have to be paid are what is required by the internal revenue code. What the internal revenue code requires is payment of employer's employee taxes on wages actually, quote, unquote, paid. That's 26 USC section 3111 paragraphs A and B. And the regulation is 26 CFR section 601 and 401. Everything I've quoted here today is in our briefing, but just so the court has it. Given his concession that we comply with the tax code and the clear language of the regulation that only requires compliance with the tax code, there is no plausible allegation here that TCS violated any obligation to pay payroll taxes. If we agree with the district court, do we have to address the SCA tax rule? No, Your Honor. Okay. The tax bar is an alternative ground for affirming that part of Judge Chutkan's ruling. If the court instead agrees with us, as she did, that there simply is no cognizable FCA obligation here to pay higher payroll taxes, then the court doesn't reach the tax bar. Of course, if the court does, we have briefed why we believe the tax bar would provide an independent basis along with the other alternative grounds for affirmance that we've briefed, lack of particularity, lack of scienter. Let me say Bicek or Lissick decision supports his view of the tax bar. What's your response? No. So the Lissick lays out this two-part test that is essentially, are these alleged violations of, you know, is this a loss based on tax revenue to the government? And is this money that the Internal Revenue Service could go after? He says the second prong isn't met because the IRS isn't authorized to recover treble damages, right? The things that you can get under the FCA. Well, if that were the test, then, right? The tax bar would be, right? There would be no tax bar because, right? This comes up in every, right? So now we have also explained why we think the test, the broader test that courts in this district have applied, which is essentially whether the claim involves a loss of tax revenue is sufficient to invoke the tax bar. We think we win either under Lissack or under the DDC cases. But again, the court reaches, needs to reach this issue or other grounds for affirmance on the tax allegation. Only if it disagrees with us and Judge Chutkin on the central point, there simply is no obligation to pay higher payroll taxes. I was going to go to visas. But yeah, that's what I want to ask you about. Um, there are two aspects of the fee regulation that might cut against you, um, and cut against my instinct that, you know, the employer can buy a bunch of different visas. And if he buys the less expensive one, that's what he gets. And he might, you know, might or might not exceed the scope of it later. But the reg says that the fees established, which is an obligation to pay the government, are associated with the benefit and are not solely determined by section 106.2. So associated with the benefit seems to suggest that the fees the employer has to pay correlate to the benefit that the employer wants. So I don't think so. Judge Katz has explained this on pages 33 to 34 of our brief, where you look at the actual visa application form. And it says that the, the application will be granted or denied based on whether you have established entitlement to the benefit you are seeking. So that's the way, I mean, this is ambiguous enough, just standing alone. I think it is not sufficient to create an established duty to pay that you need for the, you know, a false claims act violation, which is a very serious thing with tribal damages, et cetera. But the visa application form I submit makes it clear that that is not the correct interpretation of benefit. And bear in mind, your honors, every, virtually every court, virtually every judge to consider this theory of reverse false claims act liability has rejected it. Most recently, Ms. Childs, to your point, the Ninth Circuit did so unanimously in the Lesnick case. And you don't get to the fee until the application is granted. Absolutely right. The lottery, your other point that you made, and I want to get to that as well, completely disposes of this argument. But just, just to, just to get there, Lesnick cited and agreed with Judge Chutkin's decision here, the decision of the district judge in Billington. No, no, you have, you have the weight of authority. It's not just the authority. Let's go to, I mean, I'll, I'll, the reasoning, sure. And what, what the Ninth Circuit said, it explained that there is no obligation to pay the fees for a visa application that you never submitted. Now, I do want to mention, Mr. Cox. Associated with the benefit, I have your answer. What about not solely determined by 106.2? If we go to 106.2, it reads like a very reticulated and comprehensive list of, you want H-1B, you pay this, you want L, you pay that, and on and on for pages. And this first reg says the fees are not solely determined by 106.2. Right. And so, but the question is, how do you get- You know, I want to buy an L visa, so you charge me for an L visa, even if I'm intending for the workers to do H-1B work. So the regulations do say, as we say at the top of page 36 of our brief, that the fees are for filing a particular application. But even Judge Katz is taking what you just read for everything it's worth. How do you get from not solely based on what's in 106.2 to the notion that the fee is for the application you intended to get the benefit of? I mean, again, this is a serious thing to be sued under the FCA. There has to be what Congress called an established duty to pay. And if I could just finish the point on Lesnick, because Mr. Kotchin talked about it this morning. He said Lesnick relied on the Sixth Circuit's decision in ATMI. The district court in Lesnick relied on ATMI for the point that I think you were alluding to, Judge Katz, that obligation had to be fixed in amount. That is the only thing about ATMI that Congress changed in 2009, but in any event, the relator in Lesnick made this same challenge about relying on ATMI to the Ninth Circuit. And the Ninth Circuit explained this case is not about whether the obligation is fixed in amount or not. It is about the preceding threshold question of whether there's an obligation at all. And Lesnick explained quite clearly why there is. Now, Judge Child, I do want to talk about the lottery because it largely disposes. Just finish the last piece of my question, which is, if not solely determined, can't bear the full weight suggested by my question, what do you think that clause is doing? There likely is, well, I think it is likely recognizing the discretion that individual visa application officials will have to grant or deny an application in particular circumstances without regard to a fee or so on and so forth. But it is not establishing a clear duty to pay the fee for an entirely different application. I mean, you can imagine the chaos and the consternation that would result if the regime that he posits actually came into effect and everyone started submitting one type of visa application with the fee for another type of application. There is simply no support for that regime to the lottery point. That's why we have a contingent. Yes, that is why we have a contingent obligation here, right? No one has the entitlement, much less the obligation, to pay the full H-1B fee unless their request for such to be able to submit such an application is granted, which you never know if that's going to happen or not. Now, in the opening brief, Relator says, well, wait a minute. There's a $215 pre-application fee that you have to pay. So we're reduced to that being the supposed fee that was evaded. But we point out on our brief, I think it's page 36, that fee was not in place at the time. The relevant fee was between $0 and $10, which is less than the amount that TCS actually paid for the applications it actually submitted for L-1 or B-1. Every application that he suggests was improperly submitted and hence a fee was denied to the United States. No, we paid more. Now, all he says in the reply brief is that this offset theory has no basis for it. I don't know where he's getting offset. He is making a reverse False Claims Act allegation that we did not pay the government money he says that we owed. Our response is, actually, we paid more than we owed on your theory that we should have submitted the H-1B pre-application with the $0 to $10 fee. So this is a complete response. Now, he also mentions in his brief this possibility of a fee-based relationship or an implied contractual relationship. In the district court in French City, the case that he relies so heavily on from New Jersey, likewise referred to this. First of all, it's not clear to me exactly what the fee-based relationship or implied contractual relationship is. It seems to be that anyone who pays the government any fee for a license or permit or gets the benefit of a license or permit suddenly has a fee-based relationship or implied contractual relationship. That would vastly expand the scope of the FCA. It gets to your museum hypothetical, I think, Judge Katz, far beyond what it has ever been in contradiction to the Supreme Court's admonition in Escobar that the FCA is not an all-purpose anti-fraud statute. But in any event, just saying there's a fee-based relationship or an implied contractual relationship is not enough. An obligation still has to exist. The statute says it can arise from fee-based or implied contractual relationship. But it's not enough to say that exists, just like it's not enough to say there was a contract with the government, express contract. The express contract would have to create an obligation. Same thing here. There is no obligation to pay fees for applications that were never submitted. If I can talk briefly about retaliation. First of all, there's no protected activity here. Judge Chutkin correctly concluded, for the same reasons I've been discussing, there's no obligation. If there's no obligation, there can't be protected activity. It doesn't have to conclusively establish an obligation. He just has to, you know, objectively, I guess, we have to look at whether it's reasonable under circumstances for the whistleblower to believe that that's what they're doing is exposing an FCA violation, right?  Could he have had, this is the second prong of protected activity, could he have had an objectively reasonable belief that TCS was committing or would commit FCA violations? And if there is no legal obligation, the answer is no. I mean, Mr. Kachin said in his topside argument that under this court's case law, and this part is correct, you don't have to have a completed or a winning FCA claim for there to be protected activity. You don't have to have put all the puzzle pieces together, so to speak, is how this court has sometimes phrased it. But if an essential puzzle piece, legal obligation, simply does not exist, then there cannot be protected activity, you cannot have that objectively reasonable belief. But even if there were protected activity here, your honors. Why shouldn't he be protected if we conclude that his legal theory is wrong for reasons you suggest, but you know, here we are having a reasonable dispute about it. And, you know, whistleblowers are not legally trained, right? The zone of protection in retaliation provisions typically sweeps more broadly than the underlying substantive protections, right? You don't want to protect cranks, but you do want to protect people who take positions that are reasonable and later turn out to be unfounded. I agree with all of that, Judge Katsas, and I have two responses. Number one is there simply could not have been an objectively reasonable belief. I have to quibble or take issue with your suggestion that we're having a reasonable conversation. No court. I mean, French City is the only court you need to for retaliation. You need to persuade us that the FCA debate is like your his position is not just wrong, but unreasonable that he could not have had an objectively reasonable belief that this obligation existed. And at the time that the conduct was going on, no court had ever identified a source of the supposed obligation to underpay fees. French City came along later, but even French City, as the Ninth Circuit explained, didn't point to any such authority. It just declared that there is such an obligation. That's not generally in retaliation law. You don't have to win the underlying claim to still proceed on your retaliation. Absolutely. If you if there's an actual obligation out there that the employer might be violating and you think they might be violating it and you go look into it and it turns out they're not doing it, you're still going to be protected along the way. It just turns out the facts were not there. But it's not just factual uncertainty. It's legal uncertainty as well. I will if that is so, if that is so, Judge Katsas, I maintain that there is not a reasonable argument that there's an actual obligation here. Even if they're disputing whether whether legal uncertainty is a is a base, you saying that it's only factual uncertainty. I'm just trying to understand the scope of our I'm not I'm not saying that legal uncertainty can never be enough to get it. But but but standard this court has articulated is whether there is an objective, whether the relator had an objectively reasonable belief. And my submission here is that there could not have been an objectively reasonable belief that there was an obligation to pay taxes on wages that were never paid or an obligation and established duty to pay fees for visa applications that were never submitted. But even if there were, even if this fell within protected activity, the retaliation claim would still fail because he did not put his employee is not plausibly alleged that TCS was aware of any protected activity, which means the alleged. But you're distinguishing then whistleblower reports from the actual complaint. What do you mean by never on notice? Because he'd been employed since 2006. These complaints rise in May, June 2017, January 2018. And then it's during that time that he's just kind of got a downfall of a myriad of things that are happening with this employment from, you know, being misclassified the issues with respect to his promotion, being asked to go out, you know, to get another project with no support, etc. That's the alleged retaliatory activity. And there is no doubt that his whistleblower reports, his email communications put TCS on notice that he was investigating company policies and wage violations. The question is, did he? None of that is an FCA violation, right? It to be to be protected activity. You have to be investigating FCA possible FCA violation. And for the alleged retaliation to be because of the protected activity, the employer has to be aware of the potential FCA violation. Mr. Kachin this morning said, look at his whistleblower reports. He read you a few quotes. I submit those quotes. Underscore. There is nothing in the court has, I'm sure and will, I'm sure. Look at the reports in the emails. There's nothing in there that remotely says you are not paying the government money that you owe. You don't have to phrase it in FCA terms. You don't even have to know about the particular object, you know, FCA provision, but you have to put the employer on notice that this is not just about violating wage regulations or what about him mentioning unethical visa related conduct? Sure. That is applying for the wrong visa. It is not an FCA obligation to apply for the wrong visa. It could be that the visa they didn't apply for was less expensive that the fee was less expensive, right? He did not do anything to let his employers know. The issue here, boss, is that you are not making payments to the government. Now, he relies heavily in these discussions. He brought up Yasudian, Singletary. Those are traditional FCA claims and he keeps referring to the fact that he was investigating misrepresentations and alerted his bosses to misrepresentations. A misrepresentation, a false claim is an essential element of a traditional false claims act case. So that can well be enough, but it is not an element, not an essential part of a reverse FCA violation. The reverse FCA violation requires an obligation and there's nothing that he said to his employer at any time that alerted them any relevant time that alerted the employer to the fact that this was about avoiding an obligation to pay the government. That's why there's no retaliation. And I ask that Judge Chutkin's order of dismissal be affirmed. All right. Thank you. Thank you, Your Honors. Well, Mr. Kachin, you were out of time. We'll give you two minutes. Okay. Thank you, Your Honor. Look, just a couple very quick points. The argument that because an H-1B visa, for example, wasn't applied, which I think is what the Lesnick decision is discussing, at the time of the fraud, that the only visa that was sought was an L-1 visa, such that the visa fees, the H-1B visa fees weren't paid. That is contrary to a case like Conagra. So if the Reverse False Claims Act involves reducing or avoiding an obligation to pay the government, when TCS made the decision to have L-1 employees do H-1B work, it had an obligation at that point to seek the appropriate application and visa to cover the work, the H-1B visa. That obligation attached nonrefundable fees, such as the $215 fee that was discussed and the fees that preceded that. And the relevant time frame in this case, the conduct at issue here, is ongoing. If you look at TCS's visa applications and what they're doing with respect to H-1B, L-1, and visa applications, that conduct is ongoing. Second point, we talked about avoiding tax liabilities. The DOJ, to bring up the DOJ's position on this issue, they settled a case with TCS's primary competitor, Emphasis, where Emphasis was using B-1 employees to do H-1B work. There is no wage obligation associated with B-1 employees. And so what the DOJ said, and we quoted on page 28 of our brief, is that they were avoiding tax liabilities by perpetrating that fraud. With respect to an objectively reasonable basis, Mr. Keene, if you look at his emails and you look at the whistleblower reports that he submitted, he clearly was concerned, not about just visa applications, kind of a normal company policy. What he was concerned about was fraud. He continually highlighted to his superiors and to his colleagues that we have to apply for H-1B visas. We're going to have these L-1s. I think your friend on the other side says he had to have said more than this. He was concerned about fraud. He has to at least articulate that there's money that we're not paying to spread them. And that goes to the issue of, if that is the requirement of the anti-retaliation provision of the False Claims Act, then lay people are never going to be covered by that. Because that requires such a level of detail and discussion that we have spent hours researching and can articulate now, and we're lawyers. Mr. Keene is just a layperson who's just seeing improper conduct. And so you don't... If you go back to Singletary and all the way back to Yasudian, our cases do draw some line between complaining about non-monetary regulatory violations and complaining about not paying the government. Well, Yasudian, you don't have to have a completed FCA violation to have an objectively reasonable concern that there is a violation. And so the discussion here, and what Mr. Keene was complaining about was, we cannot have the L-1 conduct. We can't falsify reporting structures to try to meet L-1 regulations and have these folks do H-1B work. And so if he has to draw the next step and say, because there's visa fees, that becomes where... If that is what is required for there to be an objectively reasonable basis, whether or not there's a completed violation of the act, if that's what's necessary, then you're never going to have that retaliation, the anti-retaliation provision apply in this area. We have your argument. We'll take the case under advisement. Thank you. Thank you for your time.
judges: Wilkins; Katsas; Childs